```
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE
```

TIG Insurance Company

    v.                                  Case No. 22-cv-165-SE
                                         Opinion No. 2023 DNH 029
National Indemnity Company


O R D E R

At issue in this case is the scope of in-state activity necessary to establish specific jurisdiction over an out-of-state declaratory-judgment defendant after a successor party to the subject contract has relocated to the forum state. TIG Insurance Company ("TIG") argues that this court has personal jurisdiction over an out-of-state insurance company, Defendant National Indemnity Company ("NICO"), for the purpose of a declaratory judgment action determining the rights and obligations of the parties to a reinsurance contract originally issued in 1973. The contract was formed out of state and had not yet been breached when this suit was filed. Relying on Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28 (1st Cir. 2016), TIG argues that the court has jurisdiction because NICO's communications relating to the claim were directed to TIG in New Hampshire beginning in 2018. But there is no evidence that TIG's asserted claim meaningfully implicates any of NICO's contacts with New Hampshire. Rather, it involves

only the rights and obligations of the parties under a previously existing agreement with respect to an extrajurisdictional settlement. Consequently, the court does not have jurisdiction and the case is dismissed.

Background

NICO is an insurance company based in Nebraska that issued liability insurance to the State of Montana in effect from July 1, 1973, until July 1, 1975 ("Montana liability policy"). The Montana liability policy covered Montana for, among other things, claims asserted against the state that alleged bodily injury arising out of the state's errors or omissions.

To mitigate the potential for loss under the Montana liability policy, NICO bought reinsurance coverage from several insurance companies, including TIG's predecessor, Skandia Insurance Company Ltd. ("Skandia"). Skandia, a foreign insurance company based in Stockholm, Sweden with a U.S. Branch in New York, issued the reinsurance contract through a broker based in Chicago, Illinois. TIG succeeded Skandia at some point after Skandia and NICO entered into the reinsurance contract.

Beginning in 2000, workers at the Liberty Mine in Libby, Montana ("Libby Mine"), brought claims against the State of Montana to recover for asbestos-related injuries they allegedly suffered from working in the mine. Montana tendered the claims

to NICO in 2002. NICO and Montana litigated and negotiated NICO's defense and indemnity obligations over the next 20 years as claims continued to be made against Montana.

In 2009, Montana and certain Libby Mine claimants entered into a settlement agreement in the amount of $43 million. In 2011, NICO paid Montana a portion of the settlement amount under the Montana liability policy. NICO submitted a reinsurance bill to TIG for a portion of the amount NICO had paid. TIG paid part of the amount NICO billed in 2017.[1]

NICO brought a declaratory judgment action against Montana in February 2012 in Montana state court, seeking a determination of NICO's rights, liabilities, and duties, if any, under the Montana liability policy. Montana brought a counterclaim, seeking coverage for the miners' claims. Nat'l Indem. Co. v. State of Montana, XDDV-20120-140. Litigation related to that case lasted more than a decade. Montana and NICO eventually resolved it by entering a settlement agreement on April 19, 2022. The Montana court approved the settlement on May 25, 2022.

While in litigation with Montana, NICO sent status reports to TIG and its other reinsurers. Prior to 2018, TIG managed and received communications from NICO regarding the reinsurance contract, including NICO's litigation status reports, through

---

[1] The 2009 settlement and TIG's 2017 payment are not part of this case.

3

TIG's affiliate in Connecticut. Beginning in 2018, TIG began managing and receiving communications from NICO regarding the reinsurance contract through a different affiliate, RiverStone Claims Management, LLC. RiverStone is located in New Hampshire.

After NICO and Montana entered into the April 2022 settlement agreement, NICO advised TIG that it would bill TIG under the reinsurance contract for part of the settlement amount after the Montana court approved the settlement. On May 11, 2022, before the Montana court approved the settlement, and before NICO billed TIG, TIG filed this declaratory judgment action. TIG alleges that any amount NICO owes under the settlement agreement is not covered under the reinsurance contract. Doc. no. 1, ¶ 29. TIG alleges only one cause of action, seeking a declaratory judgment "regarding the parties' rights and obligations under the [reinsurance contract] in connection with or arising out of the 'loss' and 'loss expense' actually incurred by NICO under" the Montana liability policy. Id., ¶ 33. On or around the same day TIG filed this action, two other reinsurers brought similar suits against NICO in other jurisdictions. See Global Reinsurance Corp. of Am. v. Nat'l Indem. Co., 22-cv-3785(JSR) (S.D.N.Y. May 10, 2022); R&Q Ins. Co. v. Nat'l Indem. Co., C.A. No. 2:22-cv-01807-NIQA (E.D. Pa. May 10, 2022).

On June 6, 2022, after the Montana court approved the settlement, NICO billed its reinsurers, including TIG, for the portions of the settlement amount it believed due under their respective reinsurance agreements. On the same day, NICO filed a declaratory judgment action in the District of Nebraska against its reinsurers, including TIG. Nat'l Indem. Co. v. Aioi Nissay Dowa Ins., et al., 8:22-cv-199 (D. Neb. June 6, 2022).[2] The suits brought by the other reinsurers in the Southern District of New York and the Eastern District of Pennsylvania have since been dismissed without prejudice by agreement of the parties in favor of litigation in the District of Nebraska. Therefore, the cases currently proceeding in the District of Nebraska include all of the reinsurers for NICO's obligations under the Montana liability policy. TIG's suit here is the only case regarding reinsurance obligations for the Montana liability policy that is not proceeding in the District of Nebraska.

NICO now moves to dismiss, arguing that the court lacks personal jurisdiction over NICO. Alternatively, NICO argues that the court should transfer the case to Nebraska. TIG objects,

---

[2] NICO also brought a separate declaratory judgment action against certain other reinsurers in Nebraska on that same day. See Nat'l Indem. Co. v. Liberty Mutual Insur. Co, et al., 22-cv-200 (D. Neb. Apr. 6, 2022). The reason for, and the existence of, the second Nebraska declaratory judgment action are not material to the court's order.

5

arguing that this court can exercise personal jurisdiction over NICO and that transfer to Nebraska would be inappropriate.

I. Personal Jurisdiction

NICO contends that this court lacks personal jurisdiction over it because NICO has not had sufficient contacts with New Hampshire to support general personal jurisdiction and its contacts with TIG in New Hampshire related to this case do not support specific personal jurisdiction. In response, TIG contends that specific personal jurisdiction exists based on the parties' communications and NICO's other contacts with New Hampshire.

A. Standard of Review

When, as here, the court does not hold an evidentiary hearing on a Rule 12(b)(2) motion, the prima facie approach applies. Rodriguez-Rivera v. Allscripts HealthCare Solutions, Inc., 43 F.4th 150, 157 (1st Cir. 2022). Under that approach, the court acts "as a data collector" but not as a factfinder. Id. (quotation omitted).

As a data collector, the court takes the plaintiff's "properly documented evidentiary proffers as true and construe[s] them in the light most favorable to [the plaintiff's] jurisdictional claim." A Corp. v. All Am. Plumbing,

6

Inc., 812 F.3d 54, 58 (1st Cir. 2016). The plaintiff cannot establish jurisdiction based on allegations in the complaint but instead "must put forward evidence of specific facts to demonstrate that jurisdiction exists." Id. The court "also consider[s] facts offered by [the defendant], to the extent that they are not disputed." Id. The plaintiff bears the burden of showing that specific personal jurisdiction exists. Rodriguez-Rivera, 43 F.4th at 160.

### B. Specific Personal Jurisdiction

Because subject matter jurisdiction is based on diversity in this case, the court "must determine whether the defendant's contacts with the state satisfy both the state's long-arm statute as well as the Due Process Clause of the Fourteenth Amendment." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 258 (1st Cir. 2022). New Hampshire's long-arm statute permits personal jurisdiction over an out-of-state defendant to the extent allowed by due process. Id. TIG relies on specific personal jurisdiction, which "exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

7

To show that specific jurisdiction exists over a defendant, a plaintiff must prove all three of the following elements:

> (1)[its] claim directly arises out of or relates to the defendant's forum-state activities; (2) the defendant's contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering the defendant's involuntary presence in that state's courts foreseeable; and (3) the exercise of jurisdiction is ultimately reasonable.

Vapotherm, 38 F.4th at 258. "Contacts made after the filing of the complaint are not considered in the analysis of personal jurisdiction." AmTrans Health, LLC v. Z-Medica Corp., No. CV 08-0044ML, 2008 WL 11388106, at *2 (D.R.I. Aug. 20, 2008) (citing Harlow v. Children's Hosp., 432 F.3d 50, 61, 64-65 (1st Cir. 2005) and Noonan v. Winston, 135 F.3d 85, 93 n.8 (1st Cir. 1998)); see also Matlin v. Spin Master Corp., 921 F.3d 701, 707 (7th Cir. 2019).

    1. Relatedness

In the context of a contract claim, determining whether a claim is related to the defendant's contacts with the forum requires the court to examine the defendant's contacts during "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479

(1985). Where the "cause[] of action sound[s] in contract . . . . the relatedness inquiry hinges on whether the defendants' contacts were instrumental in either the formation or breach of the agreements in question." Carreras v. PMG Collins, LLC, 660 F.3d 549, 554 (1st Cir. 2011); see Vapotherm, 38 F.4th at 258-59.

Here, TIG points to no evidence to show that NICO's contacts with New Hampshire were instrumental to either the formation or breach of the reinsurance contract for purposes of the relatedness inquiry. It is undisputed that TIG's predecessor, a Sweden-based company with a New York branch, issued the reinsurance contract through a Chicago broker to NICO, a Nebraska company. Thus, regardless of the exact location where the agreement was formed, it is plain that it was not formed in New Hampshire.

In addition, neither TIG nor NICO had breached the reinsurance contract at the time TIG initiated this action. At that point, the Montana court had not yet approved NICO's settlement with Montana, NICO had not yet billed TIG for coverage under the reinsurance contract, and TIG had not yet denied coverage.[3] Therefore, NICO's contacts with New Hampshire

---

[3] The circumstances that existed when the complaint was filed could raise a jurisdictional question as to whether a live case or controversy existed at that time. Although neither party raised subject matter jurisdiction as an issue, the court has a

cannot have been "instrumental" to any alleged breach of the reinsurance contract. See, e.g., Harlow, 432 F.3d at 64–65.

TIG argues that, nevertheless, its claim arises out of or relates to NICO's activities in New Hampshire. TIG concedes that the Montana liability policy, the litigation between NICO and Montana, and all communications between TIG and NICO regarding the reinsurance contract prior to 2018, are unrelated to New Hampshire.[4] It contends that the relatedness prong is satisfied,

---

responsibility to inquire sua sponte into its own jurisdiction. Amyndas Pharmas., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 27 (1st Cir. 2022). The court is satisfied that the Article III jurisdictional requirements are met here because the legal issues pertaining to the parties' obligations under the reinsurance contract were "certainly impending" when the complaint was filed, the relief requested would address those issues, and the dispute is ripe. SPARTA Ins. Co. v. Penn. Gen. Ins. Co., --- F. Supp. 3d ---, 2022 WL 3214947, at *3-*7 (D. Mass. Aug. 9, 2022); Tocci Bldg. Corp. of N.J., Inc. v. Virginia Sur. Co., 750 F. Supp. 2d 316, 320-25 (D. Mass. 2010).

[4] In support of its motion, TIG relies on the declaration of William Bouvier, the Vice President, Director, Assumed Reinsurance for RiverStone. Doc. 20-2. The declaration states that although TIG's affiliate in Stamford, Connecticut "handled" matters related to the Reinsurance Claim until 2018, Bouvier, who was located in New Hampshire, was "responsible for supervising the handling of the Reinsurance Claim since 2014." Id., ¶ 7. This supervision purportedly meant that either Bouvier or someone of more senior management in New Hampshire had to give "approval for financial transactions for large claims (such as the Reinsurance Claim)." Id. TIG does not appear to contend that NICO had any pre-2018 contact with New Hampshire regarding the Reinsurance Claim or the reinsurance contract to support the exercise of personal jurisdiction. To the extent that TIG intended to make that contention based on these statements in Bouvier's declaration, that argument is not sufficiently developed to alter the court's analysis.

10

however, because, beginning in 2018, "all material activities, communications, and demands from NICO relating to the Reinsurance Claim were directed to TIG in New Hampshire." Doc. no. 20-1 at 14. These activities and communications purportedly include:

- NICO regularly communicated and corresponded with TIG regarding the Reinsurance Claim in New Hampshire;

- NICO regularly provided information relating to the Reinsurance Claim to TIG in New Hampshire;

- NICO provided regular updates to TIG in New Hampshire, including, significantly, how NICO intended to allocate and bill the Reinsurance Claim once the State/NICO settlement was approved by the court in Montana;

- TIG, in New Hampshire, reviewed and evaluated the information that had been provided by NICO and made the determination that NICO's intended approach did not comply with the parties' contract;

- NICO provided its formal notice and report of the finalized settlement to TIG in New Hampshire;

- NICO issued its demand for payment under the Reinsurance Contract to TIG in New Hampshire, in the amount of $56,808.283, and NICO demanded that TIG issue that payment from New Hampshire; and

- NICO now alleges that TIG has breached the Reinsurance Contract by virtue of its activities and determinations, including its refusal to make the demanded payment, all of which occurred in New Hampshire.

Id. at 14-15.

In support of its contention that the above activities satisfy the relatedness element, TIG relies on Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28 (1st Cir. 2016), which it calls "instructive." Doc. no. 21 at 15. In Baskin-Robbins, Alpenrose, a dairy-products manufacturer located in Oregon, entered into a franchise agreement in 1965 with Baskin-Robbins, which then had its principal place of business in California. Id. at 32. The agreement, which the parties negotiated in California, gave Alpenrose the right to operate Baskin-Robbins franchises in Washington and Oregon for a six-year term. Id. The agreement also gave Alpenrose the option to renew its franchises for successive six-year terms so long as it gave Baskin-Robbins written notice at least one year prior to the expiration of the current term. Id. In 1998, Baskin-Robbins moved its headquarters from California to Massachusetts. Id. at 33.

Alpenrose sent Baskin-Robbins formal notice of its election to renew the agreement every six years through 2007. Id. Alpenrose sent the 2001 and 2007 renewal notices to Baskin-Robbins' headquarters in Massachusetts. Id.

In December 2013, shortly before its deadline to notify Baskin-Robbins of its intent to renew the agreement for another six-year term, Alpenrose gave Baskin-Robbins written notice that it would not renew the agreement. Id. The parties then began

12

negotiating the terms of Alpenrose's transition out of the franchise arrangement. Id. In July 2014, after negotiations stalled, Alpenrose wrote to Baskin-Robbins that it wished to revoke its decision not to renew, and instead requested another six-year extension. Id. Alpenrose's letter also stated that if Baskin-Robbins did not agree to renew, Alpenrose would be due compensation under Washington law. Id.

Baskin-Robbins responded that Alpenrose had waited too long and was not entitled to renew the agreement or to receive any compensation. Id. Baskin-Robbins then brought suit in the District of Massachusetts seeking judicial declarations that the agreement would expire on December 8, 2014, and that Alpenrose was not entitled to compensation under the agreement. Id.

Alpenrose moved to dismiss for lack of personal jurisdiction or in the alternative to transfer the case to the Western District of Washington. Id. The district court concluded that it did not have personal jurisdiction and dismissed the case. Id. On appeal, the First Circuit Court of Appeals concluded that Baskin-Robbins had satisfied the elements of personal jurisdiction and reversed, remanding the case for further proceedings. Id. at 41.

With regard to the relatedness element of the analysis, the First Circuit stated: "In its complaint, Baskin-Robbins seeks declarations both that Alpenrose's second letter did not

effectively renew the Agreement (with the result that the Agreement expired on December 8, 2014) and that Alpenrose is not entitled to any compensation in connection with the expiration of the Agreement." Id. at 35. In resolving that those claims arose directly out of Alpenrose's in-forum contacts, the First Circuit concluded that "[a]lthough it is transparently clear that the Agreement itself ultimately determines the effect of Alpenrose's two letters (that is, whether those letters collectively resulted in renewal of the Agreement), it is the letters that set the present controversy in motion." Id. at 36. Because the letters were sent to Baskin-Robbins in Massachusetts, the First Circuit held that there was "a sufficient nexus between Alpenrose's letters and Baskin-Robbins' claims" to satisfy the relatedness prong of the jurisdictional analysis. Id.

TIG argues that, as with Alpenrose, NICO's contacts with TIG in New Hampshire are what "set the present controversy in motion." TIG contends that, as such, they are sufficient to establish the relatedness prong of the jurisdictional analysis. The court disagrees.

In Baskin-Robbins, the plaintiff sought a declaration that the defendant's letters did not effectively renew the parties' agreement (and therefore that it owed no damages). The court held that the fact that those letters — the legal effect of

14

which were the subject of and basis for the declaratory judgment action — were sent to Massachusetts created a sufficient nexus to satisfy the relatedness standard.

Unlike the plaintiff in Baskin-Robbins, TIG does not seek a declaration as to the meaning or legal effect of any document sent to New Hampshire. Instead, it seeks a declaration of its rights and obligations under the reinsurance contract as it pertains to the settlement agreement. Both the reinsurance contract and the settlement agreement were negotiated and formed outside of New Hampshire. Neither had been breached, here or elsewhere, at the time that NICO filed this suit.

Nonetheless, TIG contends that NICO's purported activity and communications with TIG in New Hampshire regarding the Reinsurance Claim are sufficient to satisfy the relatedness prong. There are two problems with that argument. The first is that TIG, which bears the burden of adducing evidence of specific facts to show the existence of personal jurisdiction, provides almost no specifics about NICO's communications and activity. Rather, it states simply that NICO "regularly" communicated and gave information regarding the claim, without offering any details as to the content or frequency of that activity. Indeed, TIG points to and incudes with its objection only a single pre-litigation communication from NICO to TIG in New Hampshire: an April 21, 2022 email advising TIG that NICO

15

has finalized its settlement agreement with Montana and which states that a "reinsurance billing will be submitted after court approval is received." Doc. no. 20-20 at 2. Thus, TIG has not offered specific facts to show that NICO had regular contact with New Hampshire regarding the Reinsurance Claim or the reinsurance contract.

Second, even if TIG had provided those details, it offers no support for its contention that those communications would bring this case within Baskin-Robbins' ambit. Baskin-Robbins does not establish relatedness over every party who sends communications into the forum with respect to an existing contract. As mentioned, in that case, the defendant's connections to the forum state that the court deemed sufficient to establish the relatedness prong were the defendant's letters sent to the forum state attempting to renew the parties' agreement. Whether those letters successfully renewed the agreement was the issue before the court. The contacts were not, as TIG offers here to support jurisdiction, communications generally about the parties' dispute or the plaintiff's own activity in the forum state evaluating the parties' contract. TIG cites to no authority extending Baskin-Robbins' holding to the lengths it urges here.

At bottom, to support relatedness, TIG is left with NICO's notice of its not-yet-approved settlement with Montana and its

notice of how it intended to bill TIG and other reinsurers when and if the Montana court approved the settlement. TIG believes that the fact that NICO sent these communications to it in New Hampshire is enough to satisfy the relatedness prong of the personal jurisdiction analysis. Neither Baskin-Robbins, on which TIG primarily relies, nor other First Circuit case law, supports that contention. See Connell Ltd. P'ship v. Associated Indem. Corp., No. 1:22-cv-10639, 2023 WL 122136 (D. Mass. Jan. 6, 2023). As such, TIG has failed to carry its burden to show relatedness.

### 2. Remaining Factors

TIG's failure to demonstrate relatedness between its claim in this case and NICO's contacts with New Hampshire means that this court cannot exercise personal jurisdiction over NICO in this case. A Corp., 812 F.3d at 59. Therefore, the court does not address whether TIG has carried its burden to show that NICO purposefully availed itself of the privilege of conducting activities within the forum state or whether the exercise of personal jurisdiction would be reasonable.

## II. Transfer

NICO also moves in the alternative to transfer the case to the District of Nebraska, where its suit against TIG and other

17

reinsurers is proceeding, relying on 28 U.S.C. § 1404(a). Because the court grants NICO's motion to dismiss on personal jurisdiction grounds, it does not address whether transfer would be appropriate if it could exercise personal jurisdiction over NICO.

## Conclusion

For the foregoing reasons, the defendant's motion to dismiss (document no. 7) is granted. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

March 27, 2023

cc: Counsel of record.